All right, our next case is 23-6128, Clerkley v. Holcomb, and for the appellant, Ms. Feltner. Good morning, your honors. I am Stacey Haas-Feltner, and I represent appellant Kyle Holcomb, who is a sergeant with the Oklahoma City Police Department. This appeal arises out of the Clerkley filed suit alleging that Sgt. Holcomb's use of deadly force violated Clerkley's Fourth and Fourteenth Amendment rights to be free from objective and reasonable seizure through excessive force. As a general rule, as I understand, this court's review in qualified immunity cases is limited to the questions of whether the facts that the district court ruled a reasonable jury could find would suffice to show a legal violation, and whether the law was clearly established at the time of the alleged violation. Okay, do you agree that the facts as found by the district court resulted in a constitutional violation? As found. I mean, I know you're challenging them, so. I believe that the facts as found by the district court, even if they create a, show a constitutional violation, they do not create, they do not resolve the second part of the qualified immunity test, which is whether the law is clearly established. I would like to briefly address the. No, that's fine. Because I think this is a, the court has applied the exception for clear contrary video evidence in multiple deadly force cases, including two recent cases, both of which were decided after the district court decision in this case. Those are a state of George versus city of rifle and Flores versus Henderson. In a state of George, in the state of George, the facts that the district court found were contradicted were that the suspect was frail. He had a disability. The officers made no attempt to control traffic or order the suspect to stop. And in Flores, the court found the office, found the district court finding with respect to where the officers were standing in the bedroom versus the hallway. I think that this is a case where the exception should apply because the, I believe the zoomed still foot frame from Holcomb's body cam clearly shows that there is an object in his hand or something. Is it fair to say that a, that a still captured at the very end of the video, just prior to shots being fired, clearly contradicts the district court's finding? Because I watched that video and it's, here's what it seemed like to me. That instantaneous with the kid walking around the house, you hear drop the gun, boom, boom, boom. Like with, with no break in between and just watching it without stopping it at the very end. I mean, I couldn't lay my eyes on, on something that was, that was a firearm. Well I think that that is part of the issue is it's not appropriate to stop it and to look at particular things for, because Sergeant Holcomb didn't have that luxury. I know, but don't you have to do that for your, for your position to prevail? Because without stopping it at the very moment before the shots are fired, you can see nothing. And even stopped at the very moment before shots are fired, it's very unclear what you're looking at to me. Well, I think that if it is unclear what you're looking at, that helps Sergeant Holcomb because I think the issue here is that we're not looking, the issue is not, was there something in Clerkley's hand? The issue is, was it reasonable for Sergeant Holcomb to perceive that there was nothing in the hand and he was in danger? So if the video's not clear, then that helps Sergeant Holcomb. The district court said if a jury could find that there was nothing in Clerkley's hand. That's correct, but I think that only addresses, that doesn't address the officer's reasonable perception. That comes back to the blatantly contradicted point. I don't think it does entirely because the issue of what is in the, off the suspect's hand is not the same issue as whether it's reasonable for the officer to perceive a threat. I would say the first is a factual issue and the second is a legal issue. I mean, it's sort of a threatening situation in and of itself. If that was enough, the officers, anytime someone, you know, stepped out from around the corner and surprised them in a dangerous situation, they could shoot them. You've got to perceive more. And I think Sergeant Holcomb did perceive more because the courts... I'm not saying he didn't. I'm saying we've got to decide this from a video looking at like an eight-inch hole in a fence and we, all we have is the video. But what you're deciding is not strictly what was in Clerkley's hand, but whether it was a reasonable mistake on Sergeant Holcomb's part. And I think those are two different issues. Well, but you're asking us to decide that the video blatantly contradicts the district court's finding and that's just simply not there. Well, as I said, I think this is an appropriate case, but I realize that that's not the only issue. So even if the video does not blatantly contradict the district court's finding... And we would lack jurisdiction then to consider that particular... I disagree because this court still has jurisdiction to consider the issue if it accepts the court's facts found by the district court. Now I believe that there's still a distinction between what the district court found a jury could see in Clerkley's hands and what it is reasonable for Holcomb to perceive. I mean, one of the primary cases is the state of Taylor and it's undisputed that Mr. Taylor was not armed. This was conclusively established after the shooting. So the officer couldn't have seen, didn't see, and could not have seen a gun. However, despite the absence of a weapon, it was still his perception that Taylor posed a threat, although mistaken, was still reasonable. Well, in that case, isn't that the case where the victim raised his hand like in a threatening motion and that the officer reasonably perceived that as a potential deadly threat? And the district court here found that there was no threatening motion by the plaintiff here. I thought the issue in Taylor was that he was digging in the front of his pants. And so as he started to lift his shirt, what could be an appendix pull is what the officer saw. I also think that... Isn't this a lot closer factually to Finch? Yeah, Finch. Why isn't it so very much like Finch, where we had an officer who, where we had a district court say, regardless of what you thought you saw, the videos, the various videos show that this individual didn't have a gun. And also found that a reasonable officer would not have mistakenly perceived that this individual had a gun. And that's exactly what the district court said here. Well... How is this different? I think, with respect to the issue of whether the law is clearly established, even if you find a constitutional violation, you still have to address the second part, clearly established, which is the context in which the district court looked at Finch. And for first, Finch, it can't apply because it was decided after the shooting in the instant case. But putting that aside, I think there's two critical distinctions between the facts in Finch and the facts in this case. First, in Finch, none of the officers identified themselves as police officers. Contrast that to the instant case where it's undisputed Officer Cheddar announced police were on the scene stating, hey, police department, come on out. And hey, this is a police department, come out now. And then second, the officers in Finch were relying solely on the information received from dispatch or the 911 caller. In the instant case, in contrast, Sergeant Holcomb and Officer Cheddar personally heard shots as they approached the house. And they believed that those shots were cap guns or paint guns. They believed they could be... And they sound like that in the video, on the video. That is true. But when you get to the point where Sergeant Holcomb is facing someone, there's nothing to indicate that what he sees is a cap gun. There's no orange tip. There's no... It looks... What he sees looks like a real gun. And what was found in the yard looks like a real gun. I mean, when you look... When you look at the video, can you really tell, I mean, how the... Which way the gun... But could you tell... I mean, how are you... Depending on the way the gun is pointing, I mean, how are you supposed to identify things that might out it as a cap gun? Well, it should have... I mean, a lot of cap guns or BB guns have an orange tip. Right. But if it's pointed down or it's partially in your pocket or something like that, I mean, you'll never be able to see that. To me, it looks like it's pointed as if he's doing this. Now we're going to see... You've got a better eye than I. Let me ask you one more question just so I don't keep jousting with you about facts. Do you want us... When we're considering the facts to determine whether this video is blatantly contradicted, do we look at them in a light most favorable to the plaintiff or to your client? Well, I think you have to look at it in the light most favorable to the plaintiff. Okay. But I also want you to... If you put aside my argument that we've got a blatant contradiction here, I still want you to look at the clearly established law issue because I think that is a different issue. Okay. So let me just ask you a question about that real fast. So you're going to have to give me the fact that it's not blatantly contradicted for purpose of your argument. I'm not asking you to concede that. So assuming that it's not blatantly contradicted by the video, we're then going to the whether it's clearly established. And would the question be whether it's clearly established that an officer may shoot someone where the evidence suggests that they might have been unarmed? Well, I think in Taylor, the court says that the totality of circumstances that you look at includes application of the Graham and Larson facts to the full encounter from its inception through the moment the officer employed force. In other words, Holcomb's perception of whether he sees a gun and whether it's reasonable to believe clerkly is armed has to take into account the 911 caller's information that people were going in this house with guns, that it has to take into account the shots Holcomb heard and then the announcement made by Cheddar at the front door. So Holcomb's not looking at this on an empty, a clean slate when he just sees this clerkly in the backyard. He knows that people went in the house with guns. Guns are being shot in the house, even if they might be cap guns. Which he describes as could be a cap gun from the way he heard it, right? Correct. Yeah. He knows that there's been an announcement made at the front door that police are here, come out, and then in that context he sees somebody in the backyard with something in his hand. So I think that's very different. My problem with your analysis is you're talking about subjectively what he knew and what the district court judge did here was correct, and that's to look at what a reasonable officer would do. He made this finding that a reasonable officer in Holcomb's position would not have reasonably believed that clerkly posed a mortal threat to Holcomb or others. Now if that's a fact-finding, then we're stuck with it. And your arguments about what he knew or didn't know really don't have any relevance. If it's a legal determination, that's a different question. I think it is a legal determination because in Anderson not long ago this court said the reasonableness of the use of force is a legal determination that can be determined by a sign of appeal in a qualified immunity case. And I also think that cases looking at the reasonableness of an officer's perception go back much earlier than Scott with the video exceptions. I'd like to save the last minute for rebuttal if I may. You may.  Good morning. Bob Blakemore for the FLE Lorenzo Clerkly. I really, you know, a lot of appeals on qualified immunity grounds can be very complex. I really don't think this one is overly complex. I think to me it's clear that there's no jurisdiction here because the entire appeal hinges upon disputed facts. One, they're not accepting the facts in the light most favorable to plaintiff. Well, they're arguing an exception to that rule, and that is they're saying they can because it's blatantly contradicted by the video evidence.  And I think when you review the video, and as we say in the briefing, even looking at the still, which I think is appellant appendix 212, and I've looked at it for a long time repeatedly, and I'm still not seeing a gun. And to say that it's blatantly contradicted by the record, I just don't see that. I mean, one of the cases that counsel mentioned is a state of George versus city of Rifle, and I think that that case, the facts of that case, really demonstrate how rare it is for a district court to get it that wrong when you have video evidence. That was a prolonged event on a bridge. George was suicidal. It was undisputed that he had a gun. He had a gun and at various times was either brandishing it or had it behind the small of his back. There was a finding by the district court that George was clearly frail with some form of physical disability, but the video actually showed him running around, maneuvering. There was evidence that he worked in construction. One of the other findings that the district court made in that case was that there was no effort made by the officers to control the traffic on the bridge. The evidence was contrary to that, that they requested assistance from the sheriff's office. And then third, that George stepped back over the rail, again, the district court's finding, and started jogging towards town, and he was given no warning to stop, but the video record showed that as he was jogging away, again, armed with a gun, that he was repeatedly told to stop and kept going before the shot was fired. So there's just no, there's no similarity between that kind of case and this case, where at very, very best, it's a disputed fact as to whether there was any reason for, or it was reasonable and objectively for Officer Holcomb to believe that he was in danger, that Mr. Clarkley was holding a gun, pointing it at him. We did say in the Finch case, we described that as a question of fact. The reasonableness of the officer's perception was a disputed fact for the jury, is what we said, and the district court said so, and we accepted that. But we do have other cases where we seem to suggest that reasonableness is a legal question. And I think that's what they're really arguing here, is accepting at this point, accepting that the gun, that he didn't have a gun or an object, as the district court found, even accepting that, that his belief was still reasonable. And if that's a legal question, then we do have jurisdiction to consider that. If it's a factual question. I think in this case it's inherently, it's a factual question, and you can't separate that analysis. You're looking at the objective reasonableness, the totality of the circumstances. That's traditionally and usually a decision that's going to be made by a jury when there are genuine disputes. Yeah, it seems mixed to me, in the sense that we've got some facts that a jury is going to have to decide. And to follow up on that, the essence of Graham is that we don't expect, or in this excessive force context, officers responding to a dangerous situation have to make a split-second decision. And this video, if anything, exemplifies what a split-second decision has to be. And, you know, for you to prevail, we're going to have to write an opinion that says it's objectively unreasonable. Unreasonable, I'm flipping the terminology a bit. For Holcomb to engage in this conduct where he was responding to a felony, armed people in a home, high-crime area, clerkly partially matched the description of the suspect, he was in the backyard following another officer's announcement that they come out the front door, so he might have been escaping or fleeing, and Holcomb had heard shots of some sort, maybe paintball, maybe cap gun, but maybe not. And Holcomb was exposed because clearly, one thing clear from the video is that clerkly could have seen the officer through the break in the fence. And at that point, you know, Holcomb had to make a decision, and why wouldn't that, why wouldn't in the qualified immunity aspect, even, why would it not be, or let me flip it, is it clearly established that in that fact scenario, and we need a pretty close analog for you to prevail, why wouldn't that cut in favor of the officers under the larcenous factor? There's a threat, serious crime, split-second decision, and the other facts that I mentioned. Well, and one of the, the first factor in larceny is whether there was a command for the suspect to drop the weapon. Right, and he shot, and I'll spot you that.  Drop the gun. Right, drop the gun, and whether the suspect. But that's always going to be contextual. Complied, right, and in this instance, he was given, well, for one thing, our position is it's a dispute of fact, he couldn't comply because he wasn't holding anything to drop. But more importantly than that, he wasn't given time to comply. And one of the other factors in larceny, again, is whether there was any hostile motion made. There was, there's no evidence of any hostile motion made. He didn't have time to make a hostile motion. It was less than one second after the command's made, drop it, and actually Sergeant Holcomb admits that he began shooting before he even finished the command. So this is just, there's. It's a split-second decision. It's a split-second decision, and it was unreasonable. In 20-20 hindsight, it was unreasonable. I'm sorry. In 20-20 hindsight? No. In viewing the, again, in viewing the totality of the circumstances, including the video evidence, I think most importantly, and my client from the beginning has maintained that he was never holding a gun, and there's no evidence that blatantly contradicts that. There's really no evidence that supports that he was. Well, he said he left the gun in the kitchen, but no gun was found in the kitchen. Right. And that could have been one of the other kids picked it up and put it somewhere else, or, I mean, I don't know. But there wasn't, they didn't find the Glock replica that he had anywhere near where he was when he was shot. And I don't think he would have had the presence of mind after being shot twice to, you know, pick it up and take it somewhere else and drop it. And there's no evidence anything like that happened. So, again, it's just, it's, it's, yes, it's a split second decision. But with no evidence, again, reading, reading the facts in the light most favorable to the plaintiff as, as the court must. There's, there's no evidence he was holding a weapon. There's no evidence he pointed a weapon. And without that evidence, it was correct for the court to rule that it was not a reasonable mistake. And it's clearly established that when you don't have probable cause to believe that the suspect is posing a threat of serious physical harm, that you can't use deadly force. And that's, that's what we have here. And, and really it's, it's, it's a case that where there's not an immediate jurisdiction to go, it should go back. And that's our, our position. I, if you have any other questions, I know I've got five minutes left. Thank you, counsel. You can cede your time. Thank you. And Ms. Felker, you had some rebuttal time. Yes. With respect to the jurisdictional issue, this court said in Flores, we always have jurisdiction to review questions of law. And this is after it considered, it found a blatant contradiction. But apart from that, we always have jurisdiction to review questions of law, whether we accept the district court's factual findings or not. And both with respect to whether a reasonable jury could find the facts, show a legal violation, and also whether the law was clearly established as to those facts. And in my opinion, the law is not clearly established in this case. They're relying on Finch, which was decided two years after this case. Yes, they look at the cases that come before Finch, but you've got one that's nail clippers that they think might be a knife. You've got one that is a van coming at someone, which if you go any less specific than you have to believe your life is in danger, doesn't provide much guidance. And you have a walker, a gun case, where everybody at the scene is saying there's no gun, despite the fact that the officer sees one. So in my opinion, if there was clearly established law over the past 30 years, I mean, then there would be a case more closely on point. This court has decided a lot of deadly force cases. Thank you. Thank you, counsel. We appreciate the argument. Your excuse in the case is submitted. The court will be in recess until 9 o'clock tomorrow morning, I believe. Thank you.